**ST. JOSEPH'S HOSPITAL, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, Secretary of the Department of Health and Human Services, et al., Defendants.**

**No. CIV 82–781–TUC–MAR.**

United States District Court, D. Arizona.

April 24, 1984.

---

Shalom Brilliant, Dept. of Justice, Washington, D.C., Don V. Overall, Asst. U.S. Atty., D. Arizona, Tucson, Ariz., for defendants.

Robert Klein, Richard A. Jones, Weissburg & Aronson, Inc., Los Angeles, Cal., Richard Rollman, Tracy Nuckolls, Jones, Dickerman, Nuckkols, Edwards & Smith, Tucson, Ariz., Ronald N. Sutter, Weissburg & Aronson, Inc., Washington, D.C., for plaintiffs.

## ORDER

MARQUEZ, District Judge.

Plaintiffs, hospitals, filed suit against HEW contesting the validity of the "Malpractice Rule," 42 C.F.R. § 405.452(b)(1)(ii), a recently adopted regulation which changes the formula by which hospitals are reimbursed for medical malpractice premiums by Medicare and Medicaid. Both plaintiffs and defendants have moved for summary judgment. After due consideration of the materials filed and oral argument, the motions come on now for decision.

Prior to the adoption of the Malpractice Rule, the percent Medicare reimbursed hospitals for malpractice premiums was gauged to the percent medicare patients made up the patient population at the hospital. Almost every hospital expense is reimbursed under this formula, from housekeeping to operating room expenses, as the government determined that by blending all expenses, some of which were used more by Medicare patients and some of which were used less, everything would balance out and Medicare would not be subsidizing private patients nor vice versa.

In 1976, the government commissioned a study of malpractice premiums to determine whether Medicare was picking up a disproportionately high percent. As a result, the Westat report was published that indicated Medicare patients received on the average 5.1 percent of the malpractice award dollars although Medicare paid a far greater percent of the premium costs based upon total hospital usage. Due to that report, the Malpractice Rule was promulgated which segregated out malpractice premiums to be apportioned between Medicare and private users by the actual loss claim history of the hospital and if there was none, based on the national average of 5.1 percent as determined by the Westat report.

Plaintiffs challenge the Malpractice Rule on three general grounds. This court, however, has found two arguments particularly persuasive and will discuss them in granting summary judgment for the plaintiffs.

■ Initially, plaintiffs argue the Malpractice Rule irrationally singles out malpractice costs on the basis of a rationale which is untrue and unsupported by the administrative record. This court must affirm the agency's decision to promulgate a regulation unless the party contesting the regulation can meet its burden of showing the rule was "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A), 42 U.S.C. § 139500(f). In applying this test the court must determine:

> [whether the] decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment. [citations omitted]. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *See Diplomat Lakewood, Inc. v. Harris,* 613 F.2d 1009, 1018 (D.C.Cir.1979).

■ The challenged revision of the method of apportioning malpractice costs was based on HEW's conclusion that the old method of apportionment "result[ed] in Medicare paying a disproportionate amount of malpractice costs." 44 Fed.Reg. 31641. The basis for this conclusion was the Westat report.

The Westat report reviewed nine private insurance carriers out of 50 selected by the American Insurance Association and examined all claims closed by these companies from July 1, through October 1, 1976. Insureds from these nine companies were involved in 84 percent of all claims closed by private carriers in 1976. Although this figure sounds impressive, the authors of the report warned that "conclusions must be drawn very cautiously because of the possibility of biased data." Further, in *Ethy Corp. v. E.P.A.,* 541 F.2d 1 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), the court wrote:

> Contrary to the apparent suggestion of some of the petitioners, we need not seek a single dispositive study that fully supports the Administrator's determination. Science does not work that way; nor for that matter does adjudicative fact finding. Rather, the Administrator's decision may be fully supportable if it is based ... on the inconclusive but suggestive results of *numerous studies....* *If, as petitioners suggest, one single study or bit of evidence were sufficient independently to mandate a conclusion, there would of course be no need for any other studies. Only rarely, however, is such limited study sufficient.*

*Id.* at 37–38. (emphasis added.).

In the instant case, HEW relied on only one study, the authors of which questioned its validity. Such a major decision cannot be based on such limited information and study. As such, sole reliance on the Westat report to implement the Malpractice Rule was error.

Plaintiffs next argue that HEW failed to adequately respond to the public comments received addressing the Malpractice Rule. In *Chamber of Commerce of U.S. v. O.S.H.A.,* 636 F.2d 464 (D.C.Cir.1980), the court wrote:

The Assistant Secretary should not treat the procedural obligations under the APA as meaningless ritual. Parties affected by the proposed legislative rule are the obvious beneficiaries of proper procedure. Prior notice and an opportunity to comment permit them to voice their objections before the agency takes final action.

.　　.　　.　　.　　.

An agency must also not forget, however, that it too has much to gain from the assistance of outside parties. Congress recognized that an agency's 'knowledge is rarely complete, and it must learn the * * * viewpoints of those whom the regulation will affect. * * * [Public] participation * * * in the rule-making process is essential in order to permit administrative agencies to inform themselves....' [citations omitted].

Finally, and most important of all, highhanded agency rule-making is more than just offensive to our basic notions of democratic government; a failure to seek at least the acquiescence of the governed eliminates a vital ingredient for effective administrative action.

*Id.* at 470.

 HEW received over 600 comments regarding the proposed rule, everyone of which was opposed to the new regulation. Although the Secretary need not "discuss every item of fact or opinion included in the submissions made to it in informal rule making," *National Indus. Sand Ass'n. v. Marshall,* 601 F.2d 689, 716 (3rd Cir.1979), the statement must enable the courts "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." *Id.* at 717.

The court's reading of the responses to the public comments convinces it that the above standard was not met. As such, HEW failed to follow the guidelines of the APA and the Malpractice Rule is therefore invalid.

The court therefore grants summary judgment for the plaintiffs. The matter is remanded to the Secretary for further consideration in accord with this opinion.