SOUTHWEST CENTER FOR
BIOLOGICAL DIVERSITY,
et al., Plaintiffs,

v.

Bruce BABBITT, et al., Defendants.

No. CIV.A. 99–1471.

United States District Court,
District of Columbia.

Jan. 4, 2001.

Kathleen M. Grillo, Edward J. Bennett,
Williams & Connolly, Edward Bennett
Williams, Washington, DC, for Plaintiffs.

Lyn Jacobs, David W. Hoskins, U.S. Department of Justice, Environmental Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

### INTRODUCTION

Plaintiffs (Southwest Center for Biological Diversity, Rio Grande Chapter of Trout Unlimited, Biodiversity Legal Foundation, Carson Forest Watch, Rio Grande Chapter of the Sierra Club, and Southwest Trout) challenge the decision made by the defendants, the Secretary of the Interior, Bruce Babbitt, and the Director of the United States Fish and Wildlife Service, Jamie Rappaport Clark, to deny their petition to list the Rio Grande cutthroat trout (*Oncorhynchus clarki virginalis* ) as a threatened or endangered species. Plaintiffs premise the Court's jurisdiction on the Administrative Procedures Act ("APA"), 5 U.S.C.A. 906 (1996) and the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. A. §§ 1540(c) and (g)(2000). They seek either to introduce four new documents for this Court to con-

sider in its review of the Defendants' decision or to supplement the Administrative Record with these four documents.

## The ESA Procedure

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C.A. § 1531(b) (2000). An "endangered" species is one which "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C.A. § 1532(6)(2000). A "threatened" species is one which "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C.A. § 1532(2000). The process of determining whether or not a species is either endangered or threatened is composed of six distinct steps:

1) *Petition To List a Species With the Secretary*

   —Pursuant to 16 U.S.C.A. § 1533(b)(3)(A)(2000), any person may file a petition to list a species with the Secretary.

2) *Determination As To Whether Or Not Petitioned Action Is Warranted ("90–Day Finding")*

   —Pursuant to 16 U.S.C.A. § 1533(b)(3)(A)(2000), the Secretary must determine within 90 days after receiving a petition whether or not it presents substantial scientific or commercial information to warrant further action.

3) *Review Of Species' Status*

   —Pursuant to 16 U.S.C.A. § 1533(b)(3)(A)(2000), if the Secretary determines that substantial scientific or commercial information was presented, a review of the species' status commences.

4) *Determination Regarding Review of Species' Status ("12–Month Finding")*

   —Pursuant to 16 U.S.C.A. § 1533(b)(3)(B)(2000), upon completion of the review of the species' status, the Secretary determines whether:

1) the petitioned action is not warranted

2) the petitioned action is warranted

3) the petitioned action is warranted but precluded by other factors

5) *Publication Of a Proposed Rule Listing a Species As Threatened Or Endangered*

   —Pursuant to 16 U.S.C.A. § 1533(a)(1)(2000), if the Secretary determines, based on the best scientific and commercial data available, that any one of the following factors is present, the Secretary must publish a proposed rule in the Federal Register listing such species as threatened or endangered:

   a) "the present or threatened destruction, modification, or curtailment of its habitat or range"

   b) "overutilization for commercial, recreational, scientific, or educational purposes"

   c) "disease or predation"

   d) "the inadequacy of existing regulatory mechanisms"

   e) "other natural or manmade factors affecting its continued existence"

6) *Final Determination*

   —Pursuant to 16 U.S.C.A. § 1533(b)(6)(A)(2000), the Secretary must publish, within one year of the publication of the proposed rule, a final rule in the Federal Register either:

   a) implementing the determination

   b) delaying the final determination for a period no greater than six months

   c) withdrawing the proposed rule

## The Secretary's Decision

On June 22, 1998, the Secretary of the Interior issued his 90–day finding. Based on information provided in the petition and data compiled by the New Mexico Department of Game and Fish, the Colorado Division of Wildlife, and the New Mexico Ecological Services Field Office, the Secretary found that "the petition did not present substantial information that is considered sufficiently current or accurate to support listing of the Rio Grande cutthroat trout." AR at I.J. page 10. The Secretary's findings were divided into four categories: Distribution and Population, Status in Colorado, Status in New Mexico, and Habitat Loss.

### 1) *Distribution and Population*

As to the Rio Grande cutthroat trout's distribution, the Secretary stated that data concerning its historical distribution was not conclusive and therefore comparisons between previous and current levels of distribution were difficult. In addition, although the Secretary acknowledged that the species had experienced a drastic reduction in range in recent years, the Secretary concurred with the language of the petition in finding that "[t]he amount of existing habitat capable of supporting trout is termed as 'still substantial.'" AR at I.J. page 3.

As to the Rio Grande cutthroat trout's population, the Secretary found that the information provided in the petition grossly understated the number of known populations. *Id.* Although the Secretary noted that "[b]y virtue of their occurrence in the drainage headwaters, surviving populations of *O. c. virginalis* are effectively isolated from one another, precluding genetic interchange and rendering each small population vulnerable to losses without replacement and recolonization from connected source populations," the Secretary ultimately found that existing populations within both Colorado and New Mexico were sufficiently large and stable to support translocation efforts to reclaimed waters. AR at I.J. page 4. The Secretary supported this finding by noting that the genetic purities of the extant stock were sufficiently high enough to support restoration projects. *Id.*

### 2) *Status in Colorado*

In 1973, the Colorado Wildlife Commission listed the Rio Grande cutthroat trout as "threatened." Due to the success of recovery efforts, in 1984 the trout's status was modified to a "species of special concern." Relying on the data gathered and interpreted by the Colorado Division of Wildlife, the Secretary concluded that "[s]pecific measures for population management [such as]; (1) removal of nonative species; and (2) transplantation of *O. c. virginalis* to reclaimed habitat" were sufficient. AR I.J. at page 5.

### 3) *Status in New Mexico*

First, the Secretary noted that numerous conservation efforts were ongoing within the state. For example, the Secretary cited State Game Commission regulations which limit the amount and type of fishing which may occur in certain designated waters. In addition, the Secretary cited the New Mexico Department of Game and Fish prohibition on the introduction of certain exotic species into areas populated by relatively pure trout and its management of a hatchery program to supplement declining populations.

The Secretary concluded that the conservation plans outlined by the New Mexico Department of Game and Fish were sufficient because they outline specific steps required to meet the ultimate goal of "ultimately restor[ing] the subspecies to 'a stable, reproducing member of a natural community.'" AR I.J. at page 7. In addition, "the management plans for the subspecies in both States, although in draft, have been incorporated into management actions and monitoring activities on all three national forests containing the majority of habitat for the subspecies." *Id.*

Finally, the Secretary noted that "repatriation efforts are also occurring on lands outside the national forests." *Id.*

### 4) *Habitat Loss*

The Secretary noted that the petition only provided information concerning habitat loss within New Mexico and that no information was provided as to Colorado. Based on more recent studies than those relied upon by the petitioner, the Secretary noted that the "overall watershed condition of those areas in New Mexico surveyed to be fair to good, with stable trends … [and][i]n Colorado … poor habitat conditions were responsible for 14% of historic cutthroat streams supporting populations categorized as at risk or declining." AR I.J. at page 8–9.

### 5) *Conclusion*

The Secretary concluded that the petition under-represented the total number of populations by one half and that the threat of hybridization was effectively addressed by the various management plans. AR I.J. at page 9. In addition, the Secretary noted that while human disturbances have resulted in decreases in historic numbers of Rio Grande cutthroat trout, natural environmental conditions may also be responsible for the isolation and subsequent decline in certain populations. *Id.* Finally, the Secretary stated:

> The reduction of range of *O. c. virginalis* is accurately presented in the petition, and represents a significant diminution of the occurrence of the subspecies. Also, the factors to which this reduction has been attributed (grazing, mining, road construction, logging) continue to affect watersheds, or portions of watersheds, that were once inhabited by the subspecies. However, the existing suitable habitat (4,500 to 5,000 miles of stream), that has either withstood the impacts of these practices or has not been subject to them, together with ongoing management practices of the State agencies, is considered sufficient to se-

cure the continued existence of this subspecies.

AR I.J. at 10.

### Review of the Defendants' Decision Must Be Limited to the Administrative Record

Plaintiffs argue that the court's review is not limited to the Administrative Record because their suit is being brought under the ESA's citizen suit provision. In the alternative, Plaintiffs argue that, even when a court reviews an agency's actions pursuant to the APA, a court may supplement the Administrative Record when "additional background information is necessary to determine whether the agency considered all relevant factors." *Plaintiffs Motion to Introduce Documents Or, in the Alternative, to Supplement the Administrative Record* ("Plains.Mot.") at 3. Specifically, Plaintiffs claim that the agency failed to consider whether the Rio Grande Cutthroat Trout must have a certain number of inhabitable stream miles to remain alive and the risks associated with state efforts to manage Rio Grande Cutthroat Trout presented by Whirling disease and genetic alteration.

Without any discussion or analysis, Plaintiffs cite *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), for the proposition that the ESA provides an alternative standard of review to that established by the APA which, unlike APA review, is not limited to the administrative record:

> Claims for the violation of non-discretionary duties under Section 4 are brought under the ESA's citizen suit provision and are not limited to the administrative record. The four documents (attached as Exhibits 1–4) presented by Southwest Center offer background, scientific information for the purpose of determining whether FWS failed to consider all relevant factors. Accordingly, the documents ultimately pertain to the issue of whether FWS utilized the best available scienti-

fic information. 16 U.S.C.A. § 1533(b). This non-discretionary duty under Section 4 is actionable under the citizen suit provision of the ESA. 16 U.S.C.A. § 1540(g)[1]; *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Thus, Southwest Center is not pursuing this claim under the Administrative Procedure Act, is not bound by record review, and may present extra-record documents.

Plains. Mot. at 2.

In *Bennett v. Spear*, the Supreme Court spoke to the petitioners' standing and whether certain claims, if not reviewable under the ESA, were nevertheless reviewable under the APA. There was no discussion whatsoever by the Court of any separate standard of review to be applied specifically to citizen suits brought under the ESA, let alone express approval of a *de novo* "review" of agency action which is not limited to the administrative record.

■ To the contrary, the Supreme Court held in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), that, if Congress permits judicial review of an agency's determination, expressly or implicitly, but has not set forth the standards by which that review is to be conducted, the courts limit review to the record before that agency. Building on that authority, the Court of Appeals for this Circuit specifically held that the citizen suit provisions of the ESA merely provided a right of action to challenge agency action and did not permit *de novo* review. Instead, review of an agency decision made pursuant to the ESA is limited to the administrative record. *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 684 (1982). *Accord: Newton County Wildlife Association v. Rogers*, 141 F.3d 803, 808 (8th Cir.1998)(review of citizen suits under ESA and Clean Water Act is limited to administrative record, relying on *United States v. Carlo Bianchi* Co., 373 U.S. at 709, 83 S.Ct. 1409, and *Cabinet Mountains* ); *Douglas County v. Daley*, No. 98–6204 (D.Or. March 17, 2000)(relying on *Cabinet Mountains* and concluding *Bennett v. Spear* did not affect nature of review under ESA which is limited to APA review of administrative record); *American Canoe Association, Inc. v. United States Environmental Protection Agency*, 46 F.Supp.2d 473, 475 (E.D.Va.1999)(relying on *Cabinet Mountains* and concluding that in ESA citizen suit review is limited to the administrative record).

Thus, all courts restrict review in ESA citizen suits to the administrative record and this is unquestionably the law of this Circuit.[2]

---

1. Plaintiffs' reading of the ESA to require the Secretary to premise a 90 day finding on the best available scientific information is wrong. Pursuant to 16 U.S.C.A. § 1533(b)(1)(A)(2000), a "best scientific and commercial data" standard is to be used by the Secretary of the Interior when making a determination pursuant to subsection (a)(1), *i.e.*, that step in the process wherein species are found to be either "endangered" or "threatened." Pursuant to 16 U.S.C.A. § 1533(b)(3)(A)(2000), the "substantial scientific or commercial information" standard is to be used by the Secretary when making a determination pursuant to subsection (c), *i.e.* that step in the process wherein the Secretary determines whether or not action on a petition is warranted. The Secretary's action on the plaintiffs' petition was governed by the "substantial scientific or commercial information" standard.

2. As Defendants point out, judges of this Court have invoked the principles of APA review, including limiting review to the administrative record, when considering citizen suits under ESA, section 4. *See e.g., Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 678 (D.D.C.1997): *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C.1995); *Carlton v. Babbitt*, 26 F.Supp.2d 102, 105 (D.D.C.1998); *Carlton v. Babbitt*, 900 F.Supp. 526, 529 (D.D.C.1995). The Circuit Court of Appeals invoked the arbitrary and capricious standard of the APA in considering a citizen suit challenge to an emergency listing decision under ESA, section 4. *Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C.Cir.1989). *Accord: Cabinet Mountains Wilderness*, 685 F.2d at 685 (APA arbitrary and capricious standard applied to approval of mining project claimed to violate ESA).

It must also be recalled that if a party petitions an agency, the petitioner may provide information which that party believes that the agency ought to consider before making its decision. If the agency nevertheless ignores the information, then its failure to consider that information may render its decision arbitrary and capricious because the information was so obviously important that no reasonable person would have ignored it in the consideration of the question before the agency. But, when that argument is made by a party who commenced the agency process by a petition and who had the unquestioned right to bring whatever information she sought fit to the agency's attention, but did not do so, the argument for its admission during judicial review is *non sequitur*; the agency cannot be fairly criticized for "ignoring" what the plaintiffs never brought to its attention.

■ Additionally, the process engaged in under the APA is one of judicial review of what the agency did with the information before it and not an entirely independent judicial determination of the question before the agency in which a court considers the information before the agency *and* information which plaintiffs did not bring to the attention to the agency but which it asks the court to consider. As plaintiffs have it, they may ask this Court to predicate its determination that the agency's ultimate conclusion was not justified by the evidence before the agency on evidence which the agency did not consider. That mongrel cannot possibly be called judicial review of agency action. The policy of deferring to an agency's expertise by engaging in the true form of judicial review of its decision is frustrated in the most obvious way by permitting a party who has petitioned the agency to overturn the agency's decision on the basis of evidence which it could have offered the agency but did not. The last thing a reviewing court should do is to encourage parties not to submit pertinent information to an agency and then seek the judicial overturning of agency action based on the failure to consider what the petitioning party supposedly knew but did not tell the agency. Engaging in a process of predicating a judicial conclusion of the irrationality of an agency's decision on information not before the agency is therefore understandably a perfect violation of the law of this Circuit pertaining to judicial review.

In *IMS, P.C. v. Alvarez*, 129 F.3d 618 (D.C.Cir.1997), IMS challenged the refusal of the Small Business Administration to permit it to participate in a program for socially and economically disadvantaged businesses and sought to offer into evidence four affidavits which were not a part of the administrative record. Judge Hogan, however, granted the agency's motion to strike them. The Court of Appeals, affirming Judge Hogan's decision, stated:

It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made. See *Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 850–51 (D.C.Cir.1993) ("We base our review of the Department's actions on the materials that were before the Department at the time its decision was made.") (citation omitted); *Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir.1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."). As the Supreme Court noted in 1985, "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); see also *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241,

1244, 36 L.Ed.2d 106 (1973) (per curiam) ("In applying [the arbitrary and capricious] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

.　　.　　.　　.　　.

Both parties agree that the affidavits submitted by IMS were not available to the SBA at the time it made its decision regarding IMS's participation term. IMS claims, however, that the district court should have considered the affidavits as part of the administrative record because they merely elaborated on details already included in the record. In addition, IMS argues that "even if the affidavits constituted extraneous evidence, they still should have been considered by the Court under various exceptions which permit supplementation of the administrative record." Appellant's Brief at 23.

We find no legal support for IMS's assertions. Even if IMS were correct in its claim that information that elaborates on details already in the record could be considered by the court, the affidavits in question could not be considered because they provide significant new information about the circumstances surrounding the 1987 contract that is not available in the administrative record. Moreover, the affidavits do not appear to fall within any of the accepted exceptions to the principle that the court cannot consider information that falls outside the agency record. As the district court concluded, IMS has not demonstrated that the agency failed to examine all relevant factors or to adequately explain its grounds for decision, or that the agency acted in bad faith or engaged in improper behavior in reaching its decision. This is not a case where the agency failed "to explain administrative action [so] as to frustrate effective judicial review." *Pitts,* 411 U.S. at 142–43, 93 S.Ct. at 1244. Nor has IMS made

the "strong showing of bad faith or improper behavior" required to justify supplementing the record. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

The affidavits contain information that should have been submitted to the agency before this dispute reached the courts. To allow the affidavits to be considered now would be to permit ex post supplementation of the record, which is not consistent with the prevailing standards of agency review. See *AT & T Information Systems v. General Services Admin.,* 810 F.2d 1233, 1236 (D.C.Cir.1987) ("we have repeatedly applied [the rule against supplementing the agency record] to bar introduction of litigation affidavits to supplement the administrative record") (citations omitted); Walter O. Boswell Mem'l Hosp., 749 F.2d at 793 (noting that the court had struck portions of an amicus brief that discussed affidavits not available to the agency at the time of its decision). As this court held in *Walter O. Boswell Memorial Hospital v. Heckler,* if the parties to a case "wish to contest the merits of the case by referring or submitting to the District Court any material that does not appear in the ... administrative record, they may do so only by joint stipulation." Id. at 794.

*Id.* at 623–624.

Hence, any notion that this Court may overturn an agency decision on the basis of evidence not before the agency is totally misguided.

### Extra Record Evidence May Be Considered to Ascertain whether the Agency Considered All Relevant Factors

█ As a portion of the *IMS* case just quoted indicates, a court may consider evidence not included in the administrative record to ascertain whether the agency considered all factors relevant to its decision. *See e.g., James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1094 ( D.C.Cir.1996)

8

citing *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 285 (D.C.Cir.1981), citing *Asarco v. United States Environmental Protection Agency,* 616 F.2d 1153, 1160 (D.C.Cir.1980). If the non-record information indicates a failure to consider all relevant factors, remand to the agency for consideration of that information may be in order; substitution of the court's determination for the agency's, based on the non-record information, is not. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Invoking this principle, Plaintiffs seek to introduce "Movements and Conservation of Cutthroat Trout" by Robert H. Hilderbrand (1998) (Plains. Mot. Exhibit 1). They argue:

> In rejecting Southwest Center's petition seeking a status review of the Rio Grande cutthroat trout, FWS relied on the existence of 200 Rio Grande cutthroat trout populations without considering various aspects of their viability. For example, a trout population must inhabit a sufficient number of stream miles to be considered viable. Southwest Center seeks to add a document that models the number of stream miles necessary to maintain viable populations of trout ... This background information reveals the importance of FWS' failure to consider that many of the Rio Grande cutthroat trout populations inhabit waters that fall far short of the requisite stream miles and are, therefore, not presently viable.

Plains. Mot. at 4.

In resisting the admission of this document, the agency defines the relevant factor which the agency must consider at the highest level of generality. According to the agency, the relevant factor which the agency had to consider was the statutory obligation that the agency determine whether plaintiffs' petition presented sufficient scientific or commercial information indicating that the action requested was warranted. *Defendant's Memorandum in Opposition to Plaintiffs' Motion to Introduce Documents Or, in the Alternative, to Supplement the Administrative Record* at 10–11.

While the case law is understandably imprecise as to the meaning of what are relevant factors, defining a relevant factor must mean something more than creating the tautology that the only factors relevant to the agency's decision are the factors bearing on the ultimate statutory definition of the agency's mandate. In a complicated, scientific analysis, consideration of the intermediary evidentiary factors which lead to the ultimate conclusion are the very means by which the agency renders its decision and, generally speaking, any of them can be a "relevant factor" justifying supplementation of the administrative record if ignored.

Here, an initial reading of the agency's determination suggests at least to the superficial reader that the agency would not consider the number of stream miles to be relevant because the agency considered the Rio Grande cutthroat trout to be non-migratory. The agency stated:

> "As with all subspecies of *O. clarki, O. c. virginalis* spawns from March to July, depending upon sit-specific factors such as water temperature, photoperiod, run-off timing and volume, elevation, and latitude (Sublette et al.1990). This subspecies is nonmigratory (Behnke 1992) and exhibits low vagility[3]. An individual may remain with 200 meters of its natal site throughout its lifespan, if all requirements for its survival and reproduction are met there."

AR I.J. at 2.

The apparent inconsistency between the agency's determination that the trout do not migrate and the conclusion of the 1998 study that this species must inhabit a certain number of stream miles to remain viable does not necessarily mean that the

---

**3.** According to Webster's New Collegiate Dictionary, "vagile" is defined as "free to move about." WEBSTER'S NEW COLLEGIATE DICTIONARY (1981).

1998 study should now be admitted. First, the document is dated "1998" and there is no indication it was in existence prior to June 22, 1998, the date of the agency's 90 day finding. The agency cannot be faulted for not considering a study which may not have been in existence when it reached it decision. Second, to those more familiar with the subject and who have the expertise the Court lacks, there may be no inconsistency whatsoever between the study's conclusion as to adequate stream length and the non-migratory nature of the Rio Grande cutthroat trout. Finally, plaintiffs' justification for the admission of the study emerged fully only in its reply submission to which the agency was not permitted under our local rules to answer. To permit the agency a fair opportunity to respond and to let the Court have the benefit of its expertise, I will permit additional submissions on this issue.

The agency will have its choice as to how to proceed. It may choose to have its attorneys file on its behalf a legal memorandum arguing that the 1998 study does not speak to a factor that is relevant in the agency's consideration of Plaintiffs' petition. In the alternative, the agency may consent to a limited remand to it to consider the 1998 study. In the latter event, counsel for the agency and counsel for the Plaintiff shall confer and agree to a schedule for the completion of the agency's obligations on remand and the supplemental briefing by the parties thereafter.

### The Defendants Did Consider Genetic Alteration and Whirling Disease

Plaintiffs also seek to introduce: (1) "Genetic Risks and Hazards in Hatchery Operations: Fundamental Concepts and Issues" by Craig A. Busack and Kenneth P. Currens (1995) (Plains. Mot. Exhibit 2), (2) "Fishing for Answers: Status and Trends for Coldwater Fisheries Management in Colorado" by John Epifanio, Ph. D. and David Nickum (1997) (Plains. Mot. Exhibit 3) and (3) "Hybridization and Introgression between Introduced and Native Fish" by Robb J. Leary, Fred W. Allendorf, and George K. Sage (1995) (Plains. Mot. Exhibit 4):

Additional background information is necessary to show that FWS failed to consider the impacts from state efforts to manage the Rio Grande cutthroat trout. In rejecting Southwest Center's petition, FWS relied on native trout hatchery efforts by the Colorado Division of Wildlife and the New Mexico Department of Game and Fish but failed to address their inherent risks. Southwest Center seeks to add background documents that explain problems associated with trout hatcheries such as Whirling disease and genetic alteration.

Plains. Mot. at 4–5.

But, it is first evident from the Administrative Record that Defendants did consider the effect of whirling disease. In May 1998, the Colorado State Department of Natural Resources Division of Wildlife submitted comments to the U.S. Fish and Wildlife Service. In addition to its comments, the Division of Wildlife submitted an additional copy of its current management plan for the Rio Grande cutthroat trout. According to "Status of Rio Grande Cutthroat Trout in Colorado" by John Alves, published March 30, 1998, one of the recognized threats to the cutthroat trout populations in Colorado is whirling disease:

To protect historic Rio Grande cutthroat trout populations on public land, the Colorado Wildlife Commission has approved regulations on 24 waters which prohibit the harvest of cutthroat trout. In addition, the Commission in 1996 approved a stocking policy which prohibits the stocking of fish infected with whirling disease in all cutthroat trout waters and wilderness areas. Whirling disease has been documented in wild trout populations of six streams in the Rio Grande basin. Stocking of infected fish in these waters was the primary vector of the disease. The presence of whirling disease within potential cutthroat habitat in wilderness areas has not been deter-

mined, but it is believed to be absent based on stocking records of infected fish. Historic Rio Grande cutthroat trout waters have not been stocked with whirling disease infected fish. Transmission of whirling disease by birds, mammals, and humans to currently unaffected habitat could be a threat to future distribution and status of Rio Grande cutthroat.

AR V.D.1 "Status of Rio Grande Cutthroat Trout in Colorado" by John Alves (1998) at 3.

It is also evident from the Administrative Record that Defendants did consider the effect of genetic alteration. In fact, many of the major studies which comprise the Administrative Record contain sections which discuss genetic variation, inbreeding, and hybridization. *See* "Statewide Fisheries Investigations" by William K. Stumpff (1992)(AR II.A1–5); Strategies for Development and Maintenance of a Hatchery Broodstock of Rio Grande Cutthroat Trout "(Cncorhynchus clarki virginalis)" by David E. Cowley, Ph. D. (1995)(AR II.C.2); "Status and Management of Interior Stocks of Cutthroat Trout" Edicted by Robert E. Gresswell (AR II.T.); "Status of Rio Grande Cutthroat Trout in Colorado" by John Alves (1998)(AR V.D.1).

Since the Defendants did consider these two issues before rendering their final decision, it cannot be said that they ignored a relevant factor. The Court may therefore not supplement the Administrative Record by adding to it these three studies.